RECEIVED

JAN 1 2 2016

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| HADASSA INVESTMENT SECURITY NIGERIA, LTD. | CIVIL ACTION 13-2795 |
| VERSUS | JUDGE HAIK |
| SWIFTSHIPS SHIPBUILDERS, LLC | MAG. JUDGE WHITEHURST |

## REASON FOR JUDGMENT

This matter arises out of a dispute between Hadassa Investment Security Nigeria, Ltd. ("Hadassa"), a limited business entity organized under the laws of Nigeria and with its principal place of business in Nigeria, and Swiftships Shipbuilders, LLC ("Swiftships"), a Louisiana Limited Liability Company, organized under the laws of Louisiana, with its principal place of business in Louisiana. Trial was held before the undersigned on October 7, 2015. On September 9, 2105, Hadassa filed Proposed Findings of Fact and Conclusions of Law. Additionally, on October 15, 2015, Hadassa filed a Post-Trial Brief. No trial briefing was submitted by Swiftships.

**Background:**

In 2008, Hadassa was attempting to broker an agreement between the Nigerian Navy and Swiftships for the manufacture of a number of vessels to serve the Nigerian Navy. Upon invitation, Hadassa's Alon Nelken visited the Swiftships shipyard and toured a boat originally built for the Dominican Republic, but on which it had defaulted. In 2009, Swiftships made a presentation to the Nigerian Navy at the Navy Headquarters. Subsequently, on April 30, 2009,

1

Nelken wired $500,000 to Swiftships. That money, minus a $30 transfer fee, was deposited into Swiftships bank account in the United States that same day. Hadassa claims this money was a deposit on the Domenican Republic boat shown to Alon Nelken.  Swiftships claimed the funds were to secure a prime spot in the boat building line up.

As is not uncommon in situations such as this, some period of time to finalize the deal with the Nigerian Navy was needed by Hadassa.  This fact was recognized by Swiftships, according to Mr. Calvin Leleux's testimony.  However, no party ever memorialized a time period in writing. In September 2009, however, Swiftships signed a contract with the U.S. Government for the sale of the Dominican Republic boat.  It is undisputed that Swiftships did not notify Mr. Nelken or Hadassa of the sale of the boat or the negotiations with the United States.  In fact, Mr. Nelken brought the President's delegation from Nigeria to the Swiftships yard to view the boat in May 2010, not knowing the boat was already sold.  The boat was, at that time, still physically in the yard, but ownership had been transferred to the United States government.  Mr. Nelken testified that he was not told during that visit that the boat was sold.  He was, upon return from that trip, still negotiating with the Nigerian government.  Mr. Nelken testified that he spent somewhere between $150,000 and $200,000 of his own money funding four trips to the United States, including hosting the Presidential delegation, in an effort to broker the deal.  (*Trial Transcript, Page 36, Lines 8-15*).  At some point following this trip, Mr. Nelken learned the boat had been sold.

Mr. Nelken testified that he made several phone calls attempting to receive a refund of the money and, eventually, on June 25, 2012, emailed a letter to Calvin Leleux, President of Swiftships, requesting a return of the $500,000 deposit, noting the sale of the boat and no

2

finalized deal with Nigeria yet due to a change of service chiefs.   Upon receiving no response to his initial requests, he attempted to contact Mr. LeLeux and Swiftships (through Calvin Leleux, Jeff Leleux, and Captain Perrin),  several more times by letter and telephone demanding a return of the funds.  He never received a response, nor the return of his funds.  Multiple demand letters were also mailed to Swiftships by Hadassa's counsel, with no return of the funds.

Consequently, plaintiff filed the instant suit on October 2, 2013, claiming breach of contract, failure to return deposit, and unjust enrichment.  He filed an Amended Complaint on February 17, 2014, seeking a return of the deposit, plus an equal amount under Louisiana Civil Code Article 2624.  On June 20, 2014, a Second Supplemental and Amending Complaint was filed, adding a claim for Recision of Contract due to Fraud and for Damages and Attorney Fees Pursuant to LA Civil Code Article 1958, Conversion Damages, Fraud, and Detrimental Reliance.  On January 7, 2015, plaintiff filed a Third Supplemental and Amending Petition adding a claim under the Louisiana Unfair Trade Practices and Consumer Protection Law, LA R.S. 51:1401-1430.

Hadassa further notified the Louisiana Attorney General, who sent a Notice of LA R.S. 51:1409 complaint to Swiftships, dated January 28, 2015.  Based on this Louisiana Unfair Trade Practices Claim, Hadassa seeks treble damages.

**What was the $500,000?**

The plaintiff argued the  $500,000 was wired on April 30, 2009 as a deposit on the Dominican Republic boat he inspected at Swiftships' yard as an agreement had been reached

3

between the parties for that vessel.  Swiftships argued it was earnest money or funds forwarded by Hadassa to secure a prime spot in the boat manufacturing line up, should Hadassa choose to go forward with the purchase of a vessel.

Mr. Leleux's testimony at trial, however, makes it very difficult for this Court to believe the funds were intended to secure a spot in the Swiftships line up.  For example:

**Q  Was Swiftships working at its -- at or near maximum capacity status at the time that you met Mr. Nelken?**

**A  No.**

**(*Trial Transcript, Page 83, Lines 7-9*)**

**Q Did Swiftships enter into any sort of agreement with Mr. Nelken that would ensure that he would get hastened deliveryof a boat, not necessarily the Dominican Republic boat, but a boat?**

**A There was an oral agreement.**

**Q And what did that agreement entail?**

**A The agreement was discussed in the first instance when we were in Nigeria with Mr. Nelken and his partner. He was definitely wanting to come up with a plan that would give him the best possibility of achieving success there. The amount of security that he put up with us was -- he brought up an amount in the first place, which was not satisfactory to us, to give him a spot in what we call our line so that we could build the vessel or use the Dominican vessel.**

4

Whichever one was available at that time was going to be used.

Q Sure. And with regard to selling a spot in your line, is that something that you've seen or done before?

A We have done it. It's rare today, but in the 1970s there was such a building spurt that we did sell spots in the line. We actually gave them a hull number so that those hull numbers were choice spots. They were sold the right to buy that boat. That's all that gave them was the right to buy that boat.

Q So if I'm understanding it correctly, the market dictated the need for a purchase of a slot?

A Certainly.

Q Okay. And that's something that Swiftships had participated in before?

A We have.

Q Okay. Is this the type of agreement that was reached with Mr. Nelken?

A Well, when Mr. Nelken brought the idea to bear, we were, of course, very anxious to sell anything in a fast time period because we were in a very low production time frame. So it was all in our best interest to do this and to support him to try to sell the boat as quickly as possible.

(*Trial Transcript, Page 87, Line 12-Page 88, Line 21*)


Q Did the negotiations that ultimately led up to the signing of that contract with the U.S. Navy–during those negotiations, did Swiftships get the idea that it was going to be pressed for manpower and that it was going to be using up

5

**essentially its entire yard once this contract was in place?**

**(Objection and ruling)**

**A: We didn't have any issues at that time.**

*(**Trial Transcript, Page 90, Line 21–Page 91, Line 5**)*

The testimony clearly demonstrates that Swiftships was in a low production period. Further, it had sold spots 30 or 40 years before when the production was so saturated, a preferred spot actually might have had value. Mr. Leleux admitted there was no value for Mr. Nelken in a preferred spot and that Swiftships was not pressed for manpower. There was also no indication they gave Hadassa a hull number, which would support Mr. Leleux's claim. The market dictated whether or not the purchase of a spot in the line was warranted. Clearly, under these circumstances, it was not. To argue Mr. Nelken paid $500,000 for a spot in a line in today's production period, with absolutely no supporting evidence, is disingenuous.

Further, Mr. Leleux's testimony is particularly disingenuous in light of the written evidence in the form of an email conversation between Jeff Leleux, Operations Manager at the time and President of Swiftships today, and David Ostrinsky, Hadassa employee, from October 22-23, 2009, which involves this exchange:

**From Jeff Leleux, October 22, 2009 at 9:01 a.m.:**

Good morning, David,

Alon had put a deposit on a thirty-five meter boat, not thirty meter. That being said, we could build a thirty or thirty five meter boat in 12 months from contract time.

6

**From David Ostrinsky, Hadassa employee, October 22, 2009 at 11:34 a.m.:**

Hi, Jeff–

Thanks for your quick response.  My mistake on the hull length.  Please note that Alon placed a down payment on a completed hull that I believe was originally produced for the Dominican Republic and was told the boat could be completed within three months.  Please explain the twelve month delivery period.

**From Jeff Leleux October 23, 2009 at 6:08 a.m.:**

David,

I thought you meant a new boat.  You are correct that the vessel you mentioned can be ready in 4-6 months.

*(Plaintiff's Exhibit 5)*

This unambiguous exchange, as well as the entire factual scenario of this case, support a finding that Hadassa placed the May 2009 deposit on the Dominican Republic ship which was shown to him and offered for sale.  Mr. Nelken clearly stated in his letter to Mr. Calvin Leleux on June 25, 2012, "During the meeting with the Chief of Naval Staff and your delegation, you mentioned to us that one unit of the 25M patrol boat was available and almost ready for delivery.  You also mentioned that the boat was manufactured for the Dominican Republic and due to lack of funds, the Dominican Republic could no longer purchase the boat and with your assurance that a deposit would secure the boat for us, we paid you a total sum of $500,000.00."  *(Plaintiff exhibit 6)*.  Swiftships has offered no credible evidence or testimony disputing this claim.

Mr. Nelken's version of events is supported in writing by the email exchange between Mr. Jeff Leleux and Mr. David Ostrinksy reference above.  As the facts show, the vessel Mr. Jeff

Leleux referred to in the aforementioned email exchange had already been sold to the United States government in September 2009, prior to his assurance it could be ready in 4-6 months.  It was clear at the time of the email exchange that Swiftships was misleading Mr. Nelken. Further, two letter proposals had been sent to Hadassa by Swiftships following the receipt of the deposit which failed to acknowledge the deposit or the sale of the Dominican Republic vessel. (*Defendant exhibits 1 and 2*).

Additionally, the entire exchange between the Court and Mr. Leleux beginning on Page 115, Line 22 and continuing through Page 120, Line 25 is very telling.  Mr. Leleux unambiguously acknowledged during this dialogue that the $500,000 was a deposit, which was recognized in writing by Jeff Leleux, Operations Manager of Swiftships at the time.  He further acknowledged that no parties had set any timetables in place for the completion of the deal in play and that there was no meeting of the minds, or discussion, about Swiftships keeping the deposit if the deal failed.  Finally, he admitted Swiftships never responded to Mr. Nelken's demands for a return of the money.  Clearly, the written evidence and the testimony do not demonstrate any agreement for the purchase of a preferred slot, although Mr. Leleux characterized it as Mr. Nelken's idea.  The evidence and testimony demonstrate the $500,000 was a deposit by Mr. Nelken on the Dominican Republic boat.

Article 1927 of the Louisiana Civil Code states:

> **A contract is formed by the consent of the parties established through offer and acceptance.**
>
> **Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action**

8

or inaction that under the circumstances in clearly indicative of consent.

Unless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made and te manner in which the acceptance is made.

Article 2624 of the Louisiana Civil Code states:

A sum given by the buyer to the seller in connection with a contract to sell is regarded to be a deposit on account of the price, unless the parties have expressly provided otherwise.

If the parties stipulate that a sum given by the buyer to the seller is earnest money, either party may recede from the contract, but the buyer who chooses to recede must forfeit the earnest money, and the seller who so chooses must return the earnest money plus an equal amount.
When earnest money has been given and a party fails to perform for reasons other than a fortuitous event, that party will be regarded as receding from the contract.

Although Mr. Calvin Leleux testified no formal proposal had been made concerning the Dominican Republic boat, this Court finds the evidence weighs against that argument. (*Trial Transcript, Page 97, Lines 5-7*). **It is hereby held a contract between the parties existed as there was a clear meeting of the minds and a sufficient offer and acceptance with regard to a deposit being placed on the Domincan Republic boat. It is further held the $500,000 was a deposit intended to secure the Dominican Republic boat. Finally, it is held the $500,000 is the property of Hadassa.** The completion of the contract, however, relied on Mr. Nelken's ability to secure a deal with the Nigerian Navy. Unfortunately, neither Swiftships, nor Hadassa, put any time lines or other requirements in place.

The problems which then emerged in this case arose from the failure of these two sophisticated parties to conduct a proper business transaction. By failing to reduce any of their

dealings to writing in a timely manner, we find ourselves here.  The true egregiousness, however, was not Swiftship's sale of the Dominican Republic boat, as several months had passed with no Nigerian deal secured, but in Swiftship's failure to then return the deposit or communicate in any way with Mr. Nelken and Hadassa.  Swiftships had absolutely no legal right, or even a decent argument, for the retention of those funds.  There is no evidence whatsoever supporting the contention by Swiftships that the funds would be forfeited should the contract fail.

In fact, Mr. Calvin Leleux testified as follows:

> **THE COURT: All right.  Did you ever tell him he couldn't get the money back?**
>
> **THE WITNESS: The money was not refundable.**
>
> **THE COURT: You told him that?**
>
> **THE WITNESS: No, sir, I did not.**
>
> *(Trial Transcript, Page 95, Lines 17-21)*

> **THE COURT: So when he wrote you later and said, give me my money back, why didn't you give it back to him?**
>
> **THE WITNESS: Because it was our opinion that it was not to be refunded.**
>
> **THE COURT: But you never told him that.**
>
> **THE WITNESS: I know.**
>
> **THE COURT: There's no agreement to that.**
>
> **THE WITNESS: I know, Your Honor.**
>
> *(Trial Transcript, Page 96, Line20–Page 97, Line 3)*

10

**All claims for Breach of Contract, Recision of Contract Due to Fraud/Damages and**

**Attorney Fees**

Plaintiff sued under various breach of contract theories.  This analysis applies to all. Although it is held a contract did exist between the parties and some action on the contract was taken in the form of the $500,000 deposit, the completion of the contract relied on Hadassa's ability to secure a contractual obligation with the Nigerian Navy. Swiftships may have wrongfully sold a boat on which it had received a deposit, and subsequently misled Hadassa, but there were no time lines or writings in place with regard to the second condition of the contract.   Had Mr. Nelken been able to secure a deal with the Nigerian Navy, Swiftships could possibly have provided him with a substantially similar boat to that on which he had placed the deposit, resulting in no foul.  As it is, we will never know.

The failure of the parties to conduct a reasonable and proper business transaction resulted in a contract which was partially executed, but awaiting the finality of a condition which was without specifics.  Both parties failed to fulfill their obligations which would have resulted in a finalized contract between them.

**Under the circumstances of this case, there was no breach of contract under any theory and damages for same are DENIED.  Further, the facts of this case do not constitute contractual fraud which would result in a recision of the contract. Damages for that claim are also DENIED.**

11

**Conversion**

  Under Louisiana law, a conversion is defined as "any wrongful exercise or assumption of authority over another's goods, depriving him of possession, permanently, or for an indefinite time.  One does not have to prove that the defendant consciously engaged in wrongdoing." *Ducote v. City of Alexandria,* 677 So.2d. 1118 (LA App., 3 Cir., 1996), citing *Labbe v. Premier Bank,* 618 So.2d. 45 (LA App. 3 Cir., 1993).  The First Circuit Court of Appeal in *Nathans v. Vuci* stated, "An act of conversion is a distinct act of dominion wrongfully exerted over another's property in denial of or inconsistent with the owner's rights therein."

  The Louisiana Supreme Court stated in *Dual Drilling Co. v. Mills Equipment Investments, Inc.,* 721 So.2d. 853 (LA, 1998) that a conversion is committed when any of the following occurs: (1) possession is acquired in an unauthorized manner, (2) the chattel is removed from one place to another with the intent to exercise control over it; (3) possession of the chattel is transferred without authority; (4) possession is withheld from the owner or possessor, (5) the chattel is altered or destroyed; (6) the chattel is used improperly; or (7) ownership is asserted over the chattel.  "The conversion action is predicated on the fault of the defendant and directed to the recovery of the movable or, in the alternative, the plaintiff may demand compensation." *Id.*  Generally, damages for a conversion consist of a return of the property or the value of the property.  Damages may also include mental anguish and inconvenience arising from the loss of use.

  An action for conversion has a one year liberative prescriptive period under Louisiana Civil Code Article 3492.  It is hereby held that date began to run when counsel

for Swiftships responded to Mr. Mixon's demand letter on May 21, 2014, unambiguously advising Hadassa of Swiftship's refusal to return the deposit. On that date, Swiftships clearly asserted ownership over the deposit.  Until that time, the circumstances were unclear.  Swiftships complete failure to communicate in any way made the true nature of the situation murky.  It was apparent at that time a claim for conversion arose.  As the second amended complaint adding the conversion claim was filed on June 20, 2014, the claim has not prescribed.

**It is held a conversion took place when Swiftships asserted ownership over the deposit, as evidenced by written refusal to refund, with no legal basis for retention. Swiftships is ORDERED to return the $499,970.00 to Hadassa within 60 days of the date of Judgment.**

## Fraud

Louisiana Civil Code Article 1953 defines fraud as a "misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.  Fraud may also result from silence or inaction.

Based on a plain reading of the statute, this Court can not find a fraud took place given the circumstances of the case.  The note (b)  to Civil Code Article 1953 states, "Under this Article, fraud may result not only from an act, such as a false assertion or suppression of the truth, but also from a failure to act, such as silence, that is calculated to

13

produce a misleading effect." Technically, a misleading effect or other such fraud did not

take place in this case. Swiftships was completely in the wrong for failing to return

Hadassa's deposit and for avoiding communication, but these acts do not give rise to a

fraud.

**It is held the elements of fraud are not present in this case and damages for**

**same are DENIED. The issue of prescription as to this claim is MOOT.**


## Return of Deposit, Equal Amount under LA C.C. Article 2624

**Based on the foregoing, the $499,970.00 is held to be a deposit, which should**

**have been returned under the law upon the failure of the contract. The remaining**

**claims, as they pertain to earnest money, are inapplicable in this case and DENIED.**




## Detrimental Reliance

**As there was no breach of contract and this Court has already determined**

**that both parties bear some degree of fault for the failure of the contract, the claim**

**for detrimental reliance is DENIED.** The true cause of this matter arose from

Swiftships' failure to return the $499,970 and avoidance of communication.


## Louisiana Unfair Trade Practices and Consumer Protection Law

The claim asserted most forcefully during the Trial and post-trial filings by

Hadassa is for a violation of the Louisiana Unfair Trade Practices and Consumer Protection Law,  LA R.S. 51:1401-1430.  Section 51:1409 allows for a private right of action for "for any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful" by other enumerated portions of the law. "A trade practice is unfair under the statute only when it offends established public policy and is immoral, unethical, oppressive or unscrupulous." *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 404 (5th Cir. La. 2000).  "To recover under LUTPA, a plaintiff must prove fraud, misrepresentation, or other unethical conduct." *Id.*

Swiftships argues this claim is prescribed.  LA R.S. 51:1409(E) specifically states, "The action provided by this section shall be prescribed by one year running from the time of the transaction or act which gave rise to this right of action."  Plaintiffs argue the transaction or act giving rise to the right of action took place when Swiftships filed its September 23, 2014 Responses to Interrogatory No. 1 wherein Swiftships took the position that Hadassa had forfeited its deposit, with no agreement the deposit was earnest money and no legal basis for a forfeiture.  Swiftships has not adequately responded to this argument. The Court notes, however, that Swiftships' intent to keep the money (with no legal basis to do so) was unambiguously demonstrated in its May 21, 2014 letter from Aimee Griffen, wherein Swiftships refused to return the funds.  The clear refusal to return funds it knew it was not legally entitled to was, in this Court's opinion, the unethical and unscrupulous act which gave rise to this cause of action, if a date is required.

15

The evidence shows–as the court walked through the time line specifically at trial–that Mr. Nelken learned in late 2010 or early 2011 that the Dominican Republic boat had been sold to the United States and he also knew he did not yet have a deal with the Nigerian parties.  His undisputed testimony is that he began contacting Swiftships by phone asking for a refund sometime thereafter, the date of which is unclear.  He did not put his request in writing, however, until June 25, 2012.  His testimony was that he did not submit a written request for the refund for eight months, as it was clear at that time the Dominican ship was sold and the Nigerian deal was not coming to pass . (*Trial Transcript, Page 71, Line 16–Page 72, Line 9*).  Further, Mr. Nelken testified that Swiftships was not responding to his phone calls.  He testified:

> **THE WITNESS: It was important. I was trying to call by phone.**
>
> **THE COURT: And they weren't answering your calls?**
>
> **THE WITNESS: Never.**
>
> **THE COURT: They wouldn't respond?**
>
> **THE WITNESS: No.**
>
> (***Trial Transcript, Page 72, Line 21-Page 73, Line 1***)

Clearly, the legally-unsupportable refusal to return the funds, worsened by the blatant avoidance of  communication with Hadassa,  support a claim under LA R.S. 51:1401, et seq.  Hadassa filed suit on October 2, 2013, based on the same set of facts and circumstances which underpin the LUTPA claim.  The failure to return the money is an unfair trade practice.  Until

16

Swiftships took a position, however, the circumstances of the situation were unclear.  That position was taken on May 21, 2014 and the LUTPA claim was filed in January 2015, within one year.

Alternatively, as it is actually the *inaction* of Swiftships which gives rise to the claims in this case, however, it could be found there is no one particular date on which to start the prescription clock as this is a continuing violation.  The Fifth Circuit Court of Appeals held in *Tubos De Acero De Mexico, S.A. v. American International Investment Corp., Inc.*, 292 F.3d. 471 (5th C., 2002), "Because we find these recent Louisiana appellate court opinions persuasive, and the federal district courts did not have the benefit of these cases, we hold that the continuing violation doctrine applies to the LUTPA peremptive period."  This Court recognizes the tension between the federal appellate court decision and Louisiana appellate court decisions which do not apply the continuing violation doctrine, but is bound by the law of the Fifth Circuit and agrees with it. **As such, it is held the failure to return the funds or communicate in a reasonable manner with Hadassa is a continuing violation through this date, as the funds have yet to be returned or deposited with the Court.  Based on this analysis, as well as that set forth above with regard to the May 21, 2014 date, the claim under LUTPA has not prescribed.  It is further held the failure to return the $499,970 deposit upon Hadassa's demand, with no legal basis for such refusal, was an egregious and unethical act which rose to the level of a violation of LA R.S. 51:1401-1430.**  Additionally, this Court notes that Swiftships failure to communicate with the plaintiff further strengthened the plaintiff's claims.

Plaintiff filed a Third Supplemental and Amending petition containing the LUTPA claim until January 7, 2015.  The Louisiana Attorney General sent Swiftships a Notice of R.S. 51:1401

Complaint on January 28, 2015.  To date, the ongoing violation is occurring as the funds have

not been returned or deposited into the registry of the court.  LA R.S. 51:1409 states, "If the court

finds the unfair or deceptive method, act, or practice was knowingly used, after being put on

notice by the attorney general, the court shall award three times the actual damages sustained.  In

the event that damages are awarded under this Section, the court shall award to the person

bringing such action reasonable attorney fees and costs."  **As such, it is held the plaintiff is**

**entitled to treble damages.  It is held Hadassa's damages are limited to the $499,970**

**deposit, which was wrongfully withheld by Swiftships.  It is hereby held that treble**

**damages in the amount of $1,499,910.00 are ordered in favor of Hadassa Investment**

**Security Nigeria, Ltd. and against Swiftships Shipbuilders, LLC to be paid within sixty**

**(60) days of this judgment.**

> **For clarification, the return of the deposit ordered for conversion is encompassed in**
> **the LUTPA damage award.  The full amount of the judgment rendered herein against**
> **Swiftships, on all counts and before interest and attorney fees/costs, is $1,499,910.00.**

Hadassa's claim for travel expenses for Mr. Nelken is unsupported by any concrete

evidence.  Further, much, if not all of the travel involved, was necessary while Hadassa

attempted to secure the deal he was brokering.  **As such, an award for Mr. Nelken's out of**

**pocket travel expenses is DENIED.**

Attorney fees are awarded under the statute, as noted above.  An Attorney Fee Affidavit

was submitted by Mr. Mixon in the amount of $60,130.00, which this court finds to be

reasonable and supported by the evidence.  **Consequently, it is hereby ordered that Swiftships**

18

Shipbuilders, LLC pay attorney fees and costs as submitted by plaintiff in the amount of $60,130.00 within sixty (60) days of the date of this judgment.

Finally, this Court notes it has discretion in the reward of pre-judgment interest. Under the circumstances of this case and given the award of treble damages, pre-judgment interest is DENIED.  Post-judgment interest at the current federal rate is GRANTED from the date of judgment.

THUS DONE and SIGNED on this _____11th_____ day of _____January_____, 2016.

RICHARD T. HAIK, SR., DISTRICT JUDGE

19